**IN THE UNITED DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)**

| | |
|---|---|
| **LUPIN PHARMACEUTICALS, INC.,**<br>111 South Calvert Street<br>Baltimore, Maryland 21202<br><br>                              **Plaintiff,**<br><br>    v.<br><br>**UNITED STATES FOOD AND DRUG ADMINISTRATION,**<br>10903 New Hampshire Avenue<br>Silver Spring, Maryland 20993<br><br>                              **Defendant.** | Civil Action No. ____-_____<br><br>Electronically Filed May 2, 2014 |

## COMPLAINT

Plaintiff Lupin Pharmaceuticals, Inc. ("Lupin"), by and through its attorneys, Kelley Drye & Warren LLP, as and for its Complaint against Defendant United States Food and Drug Administration ("FDA"), alleges as follows:

### NATURE OF THE ACTION

1. This is an action for injunctive and declaratory relief from a legally erroneous decision of the FDA dated April 24, 2014 ("the FDA Decision", attached as Exhibit A). This case concerns Pfizer's billion-dollar per year drug, Celebrex®, and five generic drug company's efforts to bring their generic versions of Celebrex® (celecoxib) to the market, which will be hampered by the FDA Decision.

2. The Hatch-Waxman Amendments to the Food, Drug, and Cosmetic Act gave the public access to affordable drugs by creating an abbreviated regulatory pathway for generic drug companies to bring lower-priced generic drugs to the market. The purpose of the Hatch-

Waxman Act was to gain cost savings through increased competition. In addition to making the regulatory process more affordable for generic drug companies, the Act created an incentive to generic drug companies to develop generic drugs by granting a 180-day exclusivity period to the first generic company to file an application for a generic drug with a certification that its product will not infringe a valid patent claim. The purpose of this incentive was to promote competition. The FDA Decision, however, will stifle competition.

3. Teva Pharmaceuticals USA, Inc. ("Teva") first challenged the three patents protecting the Celebrex® monopoly in 2004. The patent terms (and accompanying pediatric exclusivity periods) on two of the patents expire on May 30, 2014. The third patent (and accompanying pediatric exclusivity period) expires on December 2, 2015. In 2008, the Federal Circuit found the latest-expiring patent, U.S. Patent No. 5,760,068 ("'068 patent") invalid. With that decision, the 180-day exclusivity period attached to the '068 patent commenced and expired in 2008.

4. Years after the Federal Circuit found the '068 patent invalid, Pfizer obtained a reissued patent, U.S. Reissued patent No. RE 44,048 ("RE '048 "), from the U.S. Patent & Trademark Office ("PTO"), attempting to extend its Celebrex® monopoly from May 30, 2014 to December 2, 2015. By the time of the reissue in 2013, four more generic drug companies had submitted applications to the FDA for generic celecoxib products – Lupin, Apotex Inc. through its agent Apotex Corp. (collectively "Apotex"), Watson Laboratories, Inc. ("Watson"), and Mylan Pharmaceuticals Inc. ("Mylan"). Pfizer sued all five companies for infringement of its newly reissued patent. The U.S. District Court for the Eastern District of Virginia held that the reissued patent was invalid, thus clearing the way for generic celecoxib to come to the market on May 30, 2014.

5. The FDA Decision, however, while recognizing that RE '048 is not a new and independent patent, wrongfully created a second exclusivity period because of the reissue and awarded it to Teva. The FDA Decision is arbitrary, capricious, contrary to law, and internally inconsistent. Indeed, the FDA concluded that the original and reissued patents are treated as one patent and have one exclusivity period, but nevertheless then determined that the reissued patent resurrected the expired exclusivity period of the original patent

6. The FDA Decision identified three different positions: (a) one exclusivity period applies to an original and reissued patent, which here expired in 2008 when the 2008 Federal Circuit decision commenced the running of the clock; (b) there is a new 180-day exclusivity period because a reissued patent is a new patent which creates a new exclusivity period; and (c) one exclusivity period applies to an original and reissued patent, but a reissued patent can revive an expired exclusivity period on the original patent if it was triggered by a court decision, which is the position adopted by the FDA Decision.

7. The FDA Decision is wrong because if one exclusivity period applies to both the original and reissued patent, the reissued patent cannot revive an expired exclusivity period. The FDA Decision is correct that one exclusivity period applies to an original and reissued patent.

8. The FDA Decision will prevent Lupin from competing against Celebrex® for at least six months, and likely longer. Lupin seeks declaratory relief finding that the FDA Decision is contrary to law and that no exclusivity period is available to a generic drug company for a generic celecoxib product, and injunctive relief enjoining the FDA from withholding approval for Lupin's generic celecoxib product based on an exclusivity period awarded to another generic pharmaceutical company.

3

9. This action is brought pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 551, *et seq.*; the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. § 301 *et seq.*, as amended by the Drug Price Competition and Patent Term Restoration Act of 1984, Pub. L. No. 98-417, 98 Stat. 1585 (1984) (commonly referred to as the "Hatch-Waxman Act") (codified as amended in relevant part at 21 U.S.C. § 355 and 35 U.S.C. § 271); and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202.

## THE PARTIES

10. Plaintiff Lupin is a corporation organized and existing under the laws of the Commonwealth of Virginia and having its principal place of business at 111 South Calvert Street, Baltimore, Maryland 21202.

11. Defendant FDA is an agency within the U.S. Department of Health and Human Services, maintaining offices at 10903 New Hampshire Avenue, Silver Spring, Maryland 20993.

## JURISDICTION AND VENUE

12. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. §§ 1331 and 1361 in that this action involves substantial claims arising under the APA, 5 U.S.C. § 551 *et seq.*, and the FDCA, 21 U.S.C. § 301 *et seq.*, as amended by Hatch-Waxman Act.

13. This Court may declare the rights and other legal relations of the parties pursuant to 28 U.S.C. §§ 2201 and 2202 because there exists an actual, justiciable case or controversy between Lupin and FDA regarding the FDA Decision as to which Lupin requires: (i) a declaration of rights by this Court; and (ii) injunctive relief against the FDA.

14. The FDA Decision is a final agency action, which presents an actual controversy for which Lupin is entitled to review and relief under 5 U.S.C. § 701 *et seq*.

15. Lupin has standing to maintain this action pursuant to the APA, as a legal entity that has suffered a legal wrong and has been adversely affected by final agency action, as complained of herein.

16. This Court has personal jurisdiction over the FDA in that the agency conducts substantial business in the district.

17. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b)(1) & 1391(e)(1).

## STATUTORY AND REGULATORY BACKGROUND

### Approval of Brand and Generic Drugs by the FDA

18. In order to market a brand drug, a pharmaceutical company must submit a New Drug Application ("NDA") to the FDA for approval. *See* 21 U.S.C. § 355. The brand drug is sometimes referred to as the Reference Listed Drug ("RLD").

19. Along with the NDA, the brand company submits to the FDA "the patent number and the expiration date of any patent which claims the drug for which the applicant submitted the application or which claims a method of using such drug and with respect to which a claim of patent infringement could reasonably be asserted if a person not licensed by the owner engaged in the manufacture, use, or sale of the drug." 21 U.S.C. § 355(b)(1). The FDA lists this patent information in its publication, "Approved Drug Products with Therapeutic Equivalence Evaluations" (commonly referred to as the "Orange Book").

20. In order to market a generic drug, a generic pharmaceutical company has the option to use an abbreviated approval process by submitting an Abbreviated New Drug Application ("ANDA"), showing that its product is bioequivalent to the RLD. *See* 21 U.S.C. § 355(j). The generic company cannot market its generic drug unless it obtains final approval from the FDA. *See id.*

21. The ANDA must contain one of four certifications with respect to each patent listed in the Orange Book which the brand company claims provides patent protection for the RLD. *See* 21 U.S.C. § 355(j)(2)(A)(vii). If the generic company seeks to market the drug after the expiration of an Orange Book-listed patent, it files a "Paragraph III Certification." If the generic drug company seeks approval before the expiration of an Orange Book-listed patent, the company must make a "Paragraph IV Certification." Paragraph IV of 21 U.S.C. § 355(j)(2)(A)(vii) requires the generic company to certify "that such patent is invalid or will not be infringed by the manufacture, use, or sale of the new drug for which the application is submitted."

22. If the generic company submits a Paragraph IV Certification, it is required to provide notice to the brand drug company (the owner of the patent(s) and the holder of the NDA), together with "a detailed statement of the factual and legal basis of the opinion of the applicant that the patent is invalid or will not be infringed." 21 U.S.C. § 355(j)(2)(B)(iv)(II). This notice and detailed statement together are commonly referred to as the "Notice Letter."

**Generic Drug Savings and the 180-Day Generic Exclusivity Period**

23. The objective of the Hatch-Waxman Act is to increase competition in the pharmaceutical industry and make available lower-priced generic drugs to the public. As more generic drug companies enter the market, competition increases and drug prices tend to decline.

24. The Hatch-Waxman Act grants a 180-day exclusivity period to a generic drug company that filed an ANDA with a Paragraph IV Certification under certain circumstances. During this 180-day exclusivity period, no other generic company can enter the market.

25. If the first ANDA with respect to an RLD was filed before December 8, 2003, the effective date of the Medicare Prescription Drug, Improvement, and Modernization Act

("MMA"), pre-MMA law governs the 180-day generic exclusivity period. Under pre-MMA law, the 180-day exclusivity period was awarded on a patent-by-patent basis, as opposed to the current product-by-product approach. This means that, under the pre-MMA law, the first generic company to file a Paragraph IV Certification for each patent was eligible for a 180-day exclusivity period. Only one 180-day exclusivity period could be awarded for any patent (although more than one ANDA filer could be given "shared" exclusivity for the same time period).

26. If a generic company is awarded the 180-day exclusivity period under pre-MMA law, the FDA cannot approve an ANDA of a subsequent filer until the earlier of 180 days after either (a) the first commercial marketing of the drug or (b) the date of the final court decision holding the patent invalid or not infringed. 21 U.S.C. § 355(j)(5)(B)(iv)(I)-(II) (pre-MMA) and Pub. L. 108-173, 117 Stat. 2066 at § 1102(b)(3).

**Reissued patents**

27. Under 35 U.S.C. § 251, the PTO may reissue a patent under the limited circumstances defined in the statute. Its purpose is to correct an error in the original patent.

28. A reissued patent is not a new patent. There is no new patent term for the reissued patent; instead, the reissued patent merely takes over the unexpired part of the term of the original patent. 35 U.S.C. § 251(a). No new matter may be added via reissue. 35 U.S.C. § 251(a). Under 35 U.S.C. § 252, to the extent the claims of the original and reissued patent are "substantially identical," surrender of the original patent will not affect pending claims.

**FACTUAL BACKGROUND**

**Celebrex® NDA and Patents**

29. G.D. Searle LLC holds New Drug Application No. 020998 for celecoxib capsules, 100 mg, 200 mg, and 400 mg dosage strengths, which is sold under the name Celebrex® (G.D. Searle LLC and other corporate affiliates of Pfizer will be referred to herein as "Pfizer"). The 100 mg and 200 mg strengths of Celebrex® were approved by the FDA on December 31, 1998, and Pfizer began selling them the following year. The 400 mg strength was approved on August 29, 2002. According to the package insert for Celebrex®, the drug is indicated for osteoarthritis, rheumatoid arthritis, juvenile rheumatoid arthritis in patients two years and older, ankylosing spondylitis, acute pain, and primary dysmenorrhea.

30. At the time it began selling Celebrex®, Pfizer had listed in the Orange Book U.S. Patent Nos. 5,466,823 (the "'823 patent"), 5,563,165 (the "'165 patent") and the '068 patent as covering Celebrex®. The '823 and '165 patents expired on November 30, 2013 and the pediatric exclusivity period terminates on May 30, 2014. The '068 patent expires on June 2, 2015 and has a pediatric exclusivity period extending to December 2, 2015.

**The First ANDA Filer and the First Litigation**

31. Upon information and belief, based on allegations in recently-filed lawsuits and on the FDA Decision, Teva filed its ANDA in November 2003 and was first to submit an ANDA containing a Paragraph IV Certification to the '068 patent for approval to market generic celecoxib capsules 100 mg, 200 mg, and 400 mg dosage strengths. Teva's ANDA No. 76-898 also included Paragraph IV Certifications to the '823 and '165 patents. Teva sent a Notice Letter dated January 6, 2004, to Pfizer.

32. In February 2004, Pfizer commenced a patent infringement suit against Teva. *See Pfizer Inc. v. Teva Pharmaceuticals USA, Inc.*, 482 F. Supp. 2d 390, 398 (D.N.J. 2007) ("*Pfizer I*"). Following a trial, in a decision dated March 20, 2007, the District Court held that the patents were valid and infringed. *Id.* at 477.

33. Teva appealed and in a decision dated March 7, 2008, the Federal Circuit affirmed in part and reversed in part. *Pfizer, Inc. v. Teva Pharmaceuticals USA, Inc.,* 518 F.3d 1353 (Fed. Cir. 2008) ("*Pfizer II*"). The mandate issued on May 13, 2008. The Federal Circuit affirmed the decision with respect to the validity of the '823 and '165 patents. *Id*. at 1367. It held that the asserted claims of the '068 patent were invalid for obviousness-type double patenting because the claims were not patentably distinct from the claims of the '165 patent. *Id*.

**Other ANDA Filers**

34. Upon information and belief, based on allegations made by Mylan in pleadings, Mylan filed ANDA No. 78-857 for celecoxib and sent Pfizer Notice Letters dated March 20, 2008 and March 25, 2011.

35. Upon information and belief based on allegations made by Watson in pleadings, Watson (now also known as "Actavis") filed ANDA No. 200562 for celecoxib and sent Pfizer a Notice Letter dated February 1, 2010.

36. Lupin filed ANDA No. 202240 for celecoxib and sent Pfizer a Notice Letter dated December 30, 2010.

37. Upon information and belief based on allegations made by Pfizer in pleadings in a related case, Apotex filed ANDA No. 204197 for celecoxib and sent Pfizer a Notice Letter, dated July 17, 2012.

**Reissued Patent '048 and the Second Litigation**

38. After the Federal Circuit's decision, Pfizer sought reissue of the '068 patent on September 5, 2008.

39. The PTO reissued the '068 patent as RE '048 on March 5, 2013. Like the '068 patent, RE '048 covers methods of using celecoxib to treat arthritis and pain, including the arthritis and pain indications in the package insert for Celebrex®. Since a reissued patent expires at the same time the original patent term would have terminated, 35 U.S.C. § 251(a), the RE '048 patent term expires on June 2, 2015 and the pediatric exclusivity period ends on December 2, 2015.

40. Also on March 5, 2013, Pfizer commenced an action in the U.S. District Court for the Eastern District of Virginia against Lupin, Teva, Mylan, Watson and Apotex for infringement of RE '048 ("E.D. Va. case").

41. Pfizer listed RE '048 in the Orange Book on or around March 7, 2013, and all of the defendants in the E.D. Va. case filed Paragraph IV certifications with the FDA with respect to RE '048. *G.D. Searle LLC v. Lupin Pharmaceuticals, Inc.*, Civil Action No. 2:13cv121 (E.D. Va. Mar. 12, 2014) ("*Pfizer III*") (Exhibit B), at 4.

42. On March 28, 2013, Lupin filed its Paragraph IV Certification to RE '048 and sent a Notice Letter to Pfizer. Apotex later filed its Paragraph IV Certification to RE '048 and sent a Notice Letter to Pfizer. Teva, Watson and Mylan allege that they filed Paragraph IV Certifications to RE '048 on March 7, 2014. Lupin, Apotex, Teva, Watson, and Mylan filed Paragraph III Certifications with respect to the '823 and '165 patents.

43. On March 12, 2014, the E.D. Va. District Court granted summary judgment against Pfizer, holding that RE '048 was improperly reissued and the RE '048 application could

not be considered a divisional  The District Court held that "the claims of the '048 patent are not patentably distinct from the claims of the '165 patent." *Pfizer III* at 13-16.

44.     On the day of the District Court decision, Pfizer issued a press release stating it would appeal this decision.

45.     As of the date of this Complaint, the E.D. Va. District Court has not entered the judgment.  The parties have agreed upon the form of judgment and submitted it to the District Court.

**Celebrex® Settlements**

46.     According to a press release issued by Teva on April 17, 2014, Teva and Pfizer entered into a settlement with respect to Teva's generic celecoxib product.  According to the press release, "Under the terms of the settlement, Teva may launch its generic versions in December, 2014, or earlier under certain circumstances."

47.     Watson (Actavis) also settled with Pfizer.  According to Watson's April 24, 2014 press release:  "Under the terms of the agreement, Pfizer will grant Actavis a license to market its generic Celebrex® beginning in December 2014, or earlier under certain circumstances."

**The FDA's Exclusivity Decision**

48.     Upon information and belief based on their statements in recent pleadings, both Watson and Mylan sent letters to the FDA arguing that they should be given 180-day exclusivity in connection with RE '048.

49.     On April 7, 2014, Lupin submitted a letter to the FDA requesting approval, and explaining the reasons why no exclusivity period is now applicable to generic celecoxib products and that only one exclusivity period applies to a patent and its reissue, which can be triggered by a court decision on the original patent.

50. On April 24, 2014, the FDA issued the FDA Decision concerning 180-day exclusivity periods relating to reissued patents addressed to "Celecoxib ANDA Applicant."

51. The FDA Decision correctly determined that reissuance of a patent does not create a new patent independent of the original patent to which it relates.

52. It has long been clear that a reissued patent is not an entirely new patent. Its purpose is to correct an error in the original patent. The reissued patent cannot exceed the boundaries of the original patent. The patent is to reissue for the invention disclosed in the original patent. 35 U.S.C. § 251(a). There is no new patent term; the reissued patent merely takes over the unexpired part of the term of the original patent. 35 U.S.C. § 251(a). No new matter may be added via reissue. 35 U.S.C. § 251(a). The original patent does not become a nullity; although "surrendered," it survives in corrected form as the reissued patent. *See* 35 U.S.C. § 252. In fact, in the instant case, the '068 patent is still listed in the Orange Book against Celebrex®. A reissued patent is so designated by the PTO and is given a designation and number different from those given to new patents.

53. In the FDA Decision, the FDA stated that it applies a "single bundle of patent rights" to an original patent and its related reissued patent. The FDA stated that it "has consistently applied its single 'bundle' of patent rights approach regarding reissued patents and 180-day exclusivity and has concluded that the original and reissued patent together give rise to a single 180-day exclusivity period." (Exhibit A at 6.)

54. The FDA Decision stated again the "FDA's view that the rights to 180-day exclusivity for a reissued patent are not distinguishable from the rights to 180-day exclusivity on the original patent." (Exhibit A at 8).

55. The FDA Decision repeated its conclusion that "when a paragraph IV certification has been made to an original patent, subsequent paragraph IV certifications to a reissued patent that references the original patent should not be the basis for separate periods of 180-day exclusivity." (Exhibit A at 9).

56. The clear import of the FDA's conclusion is that there can be only one 180-day exclusivity period for the '068 patent and RE '048, and that there is no additional 180-day exclusivity created by RE '048.

57. The FDA Decision, however, stated that the statute was "ambiguous" as to whether this 180-day exclusivity period would have been triggered by a final decision invalidating the original patent, or whether it could be triggered only by a final decision invalidating the reissued patent. It concluded that the court decision on the original patent is not a triggering event once a reissued patent is listed. (Exhibit A at 10).

58. This conclusion is clearly erroneous, arbitrary and capricious. Its result is to create the second 180-day exclusivity period that the FDA Decision held clearly was not allowed by the statute and its own precedent

59. Based on the FDA Decision, it appears that only Teva (the applicant that first filed a paragraph IV certification to the original patent) is eligible for this new 180-day exclusivity period. Moreover, based on FDA Decision, it appears the Federal Circuit's 2008 decision finding the original patent (U.S. Patent No. 5,760,068) invalid did not trigger the 180-day exclusivity period because there was no consequent marketing of a generic version of Celebrex®. As noted above at paragraph 26, however, the applicable statute described the trigger in the alternative, after either (a) the first commercial marketing of the drug, or (b) the date of the final court decision holding the patent invalid. The second event occurred in 2008.

Thus, under the FDA Decision, Teva will be awarded a 180-day exclusivity period contrary to the controlling statute.

**The FDA Decision Is Arbitrary, Capricious and Contrary to Law**

60. No generic drug company is entitled to a 180-day exclusivity period because the exclusivity period relating to the original '068 patent has expired and the reissued RE '048 does not create a new exclusivity period.

*Exclusivity Relating to the '068 Patent Has Expired*

61. Under pre-MMA law, Teva's successful challenge of the '068 patent made it eligible for the 180-day exclusivity period attached to that patent.

62. The Federal Circuit's May 13, 2008 mandate on the invalidity of the '068 patent triggered Teva's exclusivity period on the '068 patent. 21 U.S.C. § 355(j)(5)(B)(iv)(II) (pre-MMA).

63. The exclusivity period on the '068 patent expired 180 days after the May 13, 2008 Federal Circuit mandate – more than five years ago.

*There Is No New Exclusivity Period for RE '048 Patent*

64. Lupin agrees with the FDA that the '068 patent and RE '048 should be treated as a single patent for the purpose of awarding an exclusivity period. Thus, any exclusivity relating to the '068 patent expired in 2008.

65. As the FDA admits, no new exclusivity period attaches to a reissued patent, and thus, there is no additional exclusivity period relating to RE '048. That is particularly appropriate in this case, where the district court ruled that the RE '048 claims are not patentably distinct from the '165 patent, just as the Federal Circuit held with respect to the original '068 patent.

66.     The FDA is wrong that the statute is ambiguous.  The statute unambiguously provides that a court decision triggers the 180-day exclusivity period.  Since the '068 patent had an exclusivity period under pre-MMA law, it was triggered by *Pfizer II* in 2008.  Since, as the FDA admits, reissued patents do not have their own exclusivity periods, there is no exclusivity period left to grant anyone for the RE '048 patent.

67.     The FDA Decision is internally inconsistent because it correctly finds that one exclusivity period applies to both the original and reissued patent, but then incorrectly finds a second exclusivity period for Teva because of the reissue.

68.     The FDA justifies its decision in the name of competition.  But the FDA Decision will stifle competition by keeping competitors and lower-priced generic drugs off the market for at least six months and probably longer.

**Mylan and Watson Are Not Entitled to Shared Exclusivity**

69.     On or around April 25, 2014, Mylan filed a related action against the FDA in the U.S. District Court for the Northern District of West Virginia, Case No. 1:14-cv-75.  On or around April 28, 2014, Watson filed a related action against the FDA in the U.S. District Court for the District of Columbia, Case No. 1:14-cv-729.

70.     Mylan and Watson allege in their complaints that they are entitled to shared exclusivity with Teva because all three generic companies filed Paragraph IV Certifications to RE '048 on March 7, 2014 – the day RE '048 was listed in the Orange Book, and hence, the earliest day a Paragraph IV Certification could be filed.  Mylan's and Watson's claims are flawed because, as the FDA decided, RE '048 does not give rise to a separate exclusivity period, and thus, the timing of the Paragraph IV Certifications to RE '048 is irrelevant.  As explained

15

above, only one exclusivity period is available for the "bundle of rights" under the original '068 and reissued RE '048 patents, and that exclusivity period expired in 2008.

**Harm to Lupin**

71.     Lupin has made substantial investments in developing, manufacturing, and preparing to market its celecoxib products. Lupin has further invested in its celecoxib products by expending substantial amounts in legal expenses in its successful challenge of RE '048. The entry of Lupin's generic celecoxib into the market will save the public hundreds of millions of dollars.

72.     If the 180-day exclusivity period is granted to one or more other generic companies, Lupin will be irreparably harmed. The other generic companies will have the ability to contract with purchasers of generic drugs, and thus, obtain a larger portion of the market at the expense of Lupin, such that Lupin will not be able sell to certain customers even when it is permitted to launch.

## CLAIM FOR RELIEF

73.     Lupin repeats and realleges paragraphs 1 through 72 as if more fully set forth herein.

74.     The FDA decision is inconsistent with the Hatch-Waxman Act, contrary to the goals of the Hatch-Waxman Act, and conflicts with the FDA's own stated policies applied to exclusivity periods for reissued patents and promotion of lower-priced generic drugs. Thus, the FDA Decision is arbitrary, capricious and contrary to law. Pursuant to 5 U.S.C. § 706(2)(A), the Court must "hold unlawful and set aside" the FDA Decision.

75.     The FDA Decision is a final agency action that is reviewable by this Court.

76.     Lupin has exhausted its administrative remedies.

77. Lupin has no adequate remedy at law.

## **PRAYER FOR RELIEF**

WHEREFORE, Lupin respectfully requests that this Court:

(1) Grant a declaratory judgment that the FDA Decision is arbitrary, capricious and contrary to law;

(2) Declare that the 180-day exclusivity period for a reissued patent is triggered by a final court decision invalidating the original patent under the applicable law;

(3) Order the FDA to grant final approval for Lupin's generic celecoxib products on May 30, 2014, or no later than the date final approval is granted for any other generic celecoxib ANDA;

(4) Enjoin the FDA from withholding approval of Lupin's generic celecoxib products based on a 180-day exclusivity period awarded to Teva, Mylan, Watson, or any other pharmaceutical company

(5) Grant such other and further relief as the Court deems just and proper.

Dated:    May 2, 2014

Respectfully submitted,

**KELLEY DRYE & WARREN LLP**

By:     /s/ Joseph D. Wilson
Joseph D. Wilson (D. Md. Bar # 18073)
3050 K Street, N.W., Suite 400
Washington, DC 20007-5108
(202) 342-8400 (phone)
(202) 342-8451 (fax)
Email: jwilson@kelleydrye.com
             docketing@kelleydrye.com
*Attorneys for Plaintiff Lupin Pharmaceuticals Inc.*